Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

District of

Division

<table>
<tr><td>William Earl Rice</td><td>)</td><td rowspan="20">Case: 1:24-cv-02918 JURY DEMAND<br>Assigned To : Unassigned<br>Assign. Date : 10/15/2024<br>Description: Employ. Discrim. (H-DECK)<br><br>Jury Trial: *(check one)*  ☐ Yes  ☐ No</td></tr>
</table>

William Earl Rice

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

M C Dean

*Defendant(s)*
*(Write the full name of each defendant who is being sued.  If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

Case: 1:24-cv-02918 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 10/15/2024
Description: Employ. Discrim. (H-DECK)

Jury Trial: *(check one)*  ☐ Yes  ☐ No

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | William Earl Rice |
| Street Address | 4465 Smallwood Church Rd. |
| City and County | Indian Head |
| State and Zip Code | Maryland 20640 |
| Telephone Number | 2403533309 |
| E-mail Address | werchuck@yahoo.com |

RECEIVED
OCT 15 2024
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## Defendant No. 1

| | |
|---|---|
| Name | M C Dean |
| Job or Title *(if known)* | |
| Street Address | 1765 Greensboro Station PL' |
| City and County | Tysons |
| State and Zip Code | VA 22102 |
| Telephone Number | 7038026231 |
| E-mail Address *(if known)* | |

## Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

### C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | NEOB (White House Campus) |
| Street Address | 725 17 St NW |
| City and County | Washington, DC |
| State and Zip Code | 20006 |
| Telephone Number | |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☐    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

☐    Relevant state law *(specify, if known)*:

☐    Relevant city or county law *(specify, if known)*:

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

B.   The Equal Employment Opportunity Commission *(check one)*:

☐   has not issued a Notice of Right to Sue letter.

☒   issued a Notice of Right to Sue letter, which I received on *(date)*    7/17/2024    .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.   Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐   60 days or more have elapsed.

☐   less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        October 15, 2024

Signature of Plaintiff

Printed Name of Plaintiff    Willaim Earl Rice

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

## M C Dean (EEOC Case)

I am addressing the response from M C Dean. (Harassment and Discrimination). The following statement is written based on my notes and recollection and is organized based on M C Dean's response to my original complaint. Starting with section "B". Dean stated that I was hired as a temporary employee to permanent employee in June 2020. I was hired through a headhunter company "Fortitude" for Dean project sites in February 2020. Dean hired me as a permanent employee in 2020 as a fire technician at the White House project. They explained my duties and ultimately expressed that all employees working on the project site must pass a top-secret clearance (GSA clearance and top-secret clearance were required.). They also expressed that all fire technicians working the fire shift (4th shift) shall/must have a blue badge to allow them to perform their duties in a timely manner. I was issued a temporary badge that allowed me to get into some locations of the campus. Then I was issued a green badge that allowed me to get into all locations with stipulations. The stipulations were, I could not go through any check point, and I could not escort anyone to assist me with the task at hand. When I was issued my green badge, I was informed that my blue badge was being processed. A blue badge has full access, no stipulations and can escort another employee to assist with tasks. Over the next following months (approximately 3-5 months), I questioned the status of my blue badge. I was told by two supervisors (Mike Dunn and Leta Fitzhugh) that my blue badge was still in the processing stage and that they were still working on it. I took that answer as a lie. I have seen other techs hired after me (that were not on fire shift) that were hired well after me receive their blue badges. This created a mental and semi physical wear and tear on me. The mental side was differences of treatment of race. On the physical side, I was accumulating 18,000 to 20,000 steps per day per shift. (The fire tech shift was Friday, Saturday and Sunday 12.5 hours each day).

I accepted their answer and did not check the status of my blue badge until sometime later after an incident happened on my shift. They hired a friend/coworker (Brandon Mayhew). At the time of hiring him, I had been there roughly a year. Brandon received his blue badge within a 3-to-4-month period. The difference between Brandon and myself is licensing. I have certificates to work on fire systems that were issued by a previous security/fire company that I have worked for prior. Brandon has a NICID that lets him work on the same fire systems I can work on. The only difference between me, Brandon and others that have received blue badges, is their race. I am black and they are white. Brandon Mayhew became my escort at that time without having passed a security clearance at that time.

Dean stated, "my employment was mostly uneventful until 2022." I began to miss days (not unexcused) and was rarely tardy. The tardiness record began to accumulate as it was required to use the time clock for our accounted time. The time clock was not user friendly. Typically,

four to eight people had to use the time clock around the same time. Our shift began at 7 a.m. If an employee clocked in before 6:59 a.m. and after 7:00:30 that employee would incur a time violation. The same penalty came at the time of clocking out at the end of shift. For example, if four people were clocking out, the 2nd, 3rd and 4th person were in a time violation. The other reason for time violations included delays getting into the building due to K-9 Enforcement. For example, I would get to work with plenty of time to clock in on my scheduled time, but we had to wait for our vehicles to be checked by security K-9 Enforcement. We would have to wait for K-9 Enforcement for approximately 10 to 25 minutes on any given day which caused me to clock in late (with others on that shift to clock in late including supervisors). Supervisors witnessed this take place especially on the 4th shift. The disparities that went with that was blacks when they punched in late heard the phrases like, "Y'all have to adjust to K-9", while whites heard phrases like, "We have to do something about the K-9 crew" and were given forgiveness.

It states that in Dean's response that my unexcused absences and tardiness led to my termination. The unexcused absences and tardiness according to Tony Arrington lead to my termination. "In January of 2023, Mr. Rice began to complain to Mr. Arrington about his former manager." I never had any issues with the former manager. Mr. Arrington expressed, "Mr. Rice believed things were being operated by the 'good old boys' network'." I never expressed anything of that nature. I expressed to Mr. Arrington on many occasions my complaints about disparagement. Mr. Arrington requested six months to make changes. I clearly agreed to give him six months for change to allow fair play on the field. Mr. Arrington also expressed that only my performance would determine my success within M C Dean. Dean states that I missed or was tardy 40 separate times from April 2022 to April 2023. I am not disputing the tardiness due to the clarification about the time clock and K-9 enforcement noted in the earlier paragraph. Others were late that amount of time or more and those are the ones who received forgiveness. I did miss the shift around the dates of April 7, 2023, to April 10, 2023. I informed Mr. Arrington that I would bring my doctor's notes to Vince Berry, another shift supervisor, the following Friday after my appointment to clear me to come back since Mr. Berry was no longer at the job site. (During Mr. Berry's brief encounter at the White House job site the employment of 3 blacks were ended at that time for speaking in a disparity/discrimination area.) Mr. Berry was relocated. I called/text each morning of those dates. I had not gone to the hospital because my absence from work had not totaled 3 days. I went to the hospital after the 3rd day. When I returned to work, I expressed to Mr. Arrington through text that I had my doctor's notes. I also told him that I had an appointment before they cleared me to go back to work. Mr. Arrington texted me on Thursday, April 27, 2023. I informed him that I would bring my doctor's notes. Instead on the following Thursday, 4/27/23, Mr. Arrington called me roughly around 12:00 noon. We discussed my doctor's notes and my appointment scheduled for April

28, 2023.  In that conversation, Mr. Arrington for the 2nd time insisted with his coercion for me to quit. (The first time was when I presented my offer letter from another agency.  He questioned, "Why don't you just quit.")  We ended the call with me saying, "I'll see you tomorrow, if the doctor clears me to come back to work."  Mr. Arrington texted me at approximately 9:30 p.m. on April 27th to inform me that they were no longer going to retain me as an employee.  I replied with, "Tony, you are aware that I have a doctor's note."  He said, "yes".  I said, "Tony, I am shaking your hand through the phone."  The phone call ended without any attitude or disrespect.


Mr. Arrington said in his response in our conversation over the phone on the night of the 27th that I expressed to him that my wife had medical issues that I had to attend to. I never indicated that I had a wife to anyone. In March of 2022, I indicated that my lady friend needed medical assistance after an aneurism and stroke.

At that time, I started requesting hours off and sometimes a day of my shift.  Those were the times that I accumulated missing time.  All my requests to miss time were discussed with my supervisor and shift lead. My supervisor eventually spoke to me about my attendance and informed me of the FMLA procedures.  Before that discussion of FMLA, I was clueless to FMLA.  My thought, that my supervisor should have informed me about something like that to cover my assistance to my lady friend.  Once again that brought on the stress and thought pattern of disparities.  About two to three months after that, my shift's lead's wife had a stroke.  Within two hours of the news of her stroke, my shift lead was offered any type of assistance that you can name (i.e., hotel fees, money), this assistance that he was offered came from my shift lead's mouth. I spoke up about disparagement because we were treated differently in the same situation.  I'm going to cut this off because I don't want to fill this area up with disparagement. If you need any more stories, let me know.  I have plenty of them...in fact so many of them that my shift leader (Dennis Fowler) apologized to me many times because of the disparagement that he witnessed.  The apologies continued from him until I had to with a stern tone ask him to stop apologizing for something that he had not done to me...yet.

I spoke briefly with my former supervisor Mike Dunn about the differences in treatment.  Other than speaking with him, Mike and I had no issues.  I thought he was taken advantage of because of his fairness.

As the months went by, Brandon Mayhew finally quit.  He quit because, in our communication, he expressed that he was tired of the "bs" at the White House.  The result of him quitting made me the only tech on the shift.  I handled all tours and tickets for months, maybe four to five months.  Our shift never went below 93-95% completion rate on our tours and tickets.  They

started allowing other techs to come in as overtime on my shift to help me with the tickets. The techs scheduled for overtime did not help with any of my tickets. They only came to work to complete existing tickets from their shifts. My complaints started again verbally when they allowed Scott Weslocky to come in on overtime and sit for just about the entire shift in front of the shift lead. I only spoke up about that because overtime must be approved and the money must come from somewhere, and since I was not worthy of a raise, I am going to put a guy coming in sitting down to be the cause of other guys not getting raises. Many incidents happened over time with Scott coming in and sitting down in front of the shift lead. The last incident led me to verbally expressing in a stern tone that I was sick of it. The incident was Scott, who is a plumber, was approved to work overtime. I had pump run testing for all buildings. They also gave me a ticket to do plumbing at the same time of my pump runs. I said, "There is a plumber sitting next to you. I am a fire technician." The next week, I voiced that to Mr. Arrington, his reply was he would investigate that. Scott continued to come in on overtime out of uniform and sit in front of my shift lead. I left that subject alone because the disparagement was weighing on me mentally with overbearing pressure.

Sometime later a new fire tech was hired on my shift. (Eric "I don't know his last name"). Eric was introduced as having his NICID-II which suggests that he had knowledge about the job but needed to know where the equipment could be found. When I showed him where the equipment was it was clear that he was not familiar with completing the tasks. So, I took lead without insulting him because I wanted him to learn the building because having another fire tech on staff would take the weight off the other fire techs. He only worked on campus for approximately 1 month. Dennis reported that Eric would no longer work at the White House campus because he could not pass his clearance.

The next month had rolled around and every month we had to do the same tasks. I had pump runs again that were scheduled for a Saturday. I did the pump runs all day in all buildings. I came back to the main office at the end of the day to do paperwork. My shift lead asked me to go move a trash can out of the building. The request to move a trash can out of the building came in on Tuesday for another shift to do. Since we were coming in again on Sunday morning and I only had time to do paperwork it would have taken me that amount of time to go to move the trash can. I did not tell my shift lead that I would not do it. I requested to do it on Sunday morning. The next morning, I came in and requested a shift meeting (we're allowed to do that). The meeting was about how to be more productive without beating up the techs. Since I was the only tech on shift, besides the new guy (Eric) who had only been there a few shifts before, no longer working with the company. I started the meeting and informed everyone in the meeting (shift lead and techs) that I was recording the meeting with my phone. They seem to take offense to that as in kill the messenger before they hear the message. I started the meeting and directed strategies on how to be productive. I used the example of the trashcan

incident on Saturday.  If a tech is already tired from working 12.5 hours on Saturday and you ask him to complete a ticket generated during the week the task is not a priority and can be done the next day.  I only had time to complete my paperwork.  Furthermore, we are not supposed to complete the tickets for other shifts unless there is a legitimate reason.  Taking the trashcan out would have taken up that time before we had to clock out.  Although I did not mind getting the trash can, the constant walking caused knee pain would cause me to miss work the next day.   (18,000 –20,000 steps mentioned on page 1 in paragraph 1). When starting my strategy production speech, the new guy, Eric, questioned me by asking what else I was doing in a smart tone. I immediately returned that tone to him and asked him who did he thing he was.  We had a few stern tone words.  He chose to jump up and tell our shift lead that he did not have to listen to this and proceeded to storm out of the room.  As he was leaving the room, I said to him, "You can leave, that's your privilege."  After he left, I continued the meeting.  I expressed 90% of things that would be productive.  About 10% was addressing the negativity of kill the message not the messenger.  Throughout that 10% I reiterated to my shift lead that I do three times as much work as the other guys.  That meeting was about 25 to 30 minutes.  I do have the recording if it is necessary to view.  At the end of the meeting, Dennis handed me the tickets for that day that had come in. There were six tickets that we were to handle as techs.  Dennis, Mike and Eric took three of the tickets.  I alone took the remaining three.  Those numbers proved my point of the numbers I expressed in the meeting that I complete three times the work of my coworkers.  Nevertheless, I do not mind the workload.  It keeps me out of their face.

That evening, I received a text to come back to the office at 6:30 p.m. which is roughly a half hour before we come back to the main building.  I got back to the main building at 6:30 p.m. and was informed that Vince asked that everyone be at the office by 6:30 p.m. because he would be coming up that day.  That was strange because it was a Sunday.  Vince came in and spoke to everyone. When he got to me, he spoke to me and said, "What's your side of the story Chuck?" with a tone I did not understand.  When I asked him what he was talking about (I did not know why he was there.)?  He said that he got phone calls telling him that I was throwing racial slurs around.  I was very surprised.  I do speak in factual terms but never do I through racial slurs around.  He voiced to me that the racial slur was when I said that Eric was using his white privilege.  I told him that I never said white privilege.  I told him that he had the privilege to leave.  Vince said, "That maybe he perceived it that way even if you didn't say that."  I said, "I can't do anything about how someone perceives something but if they said that I said something that I didn't say, then that would be a lie."  I told him exactly what I said and every conversation that I was having in that meeting.  I also informed him I had a recording if he would like to see if I said what he accused me of saying. He questioned me on why I felt that I had to record meetings.  Because I have been on this planet a long time, and I know that I can

be accused of something and offered to show him the recording again. He said that he did not need to see the recording. I replied with then you don't want to get to the bottom of the problem. He replied, "I see where the problem is." That conversation started to go sideways because he accused me of having a defensive tone while talking to him. He was right. I did have a defensive tone, because I was being accused of something and I was defending myself. I offered him to see the recording for the third time. His reply was I don't have time to look at no recordings. By this time, the back and forwards were not going anywhere. Johnny Mobley muddled out of his mouth in a frustrated type of way "Chuck didn't say that." Vince ignored hearing that from another person that I didn't say it. It went on for a little bit more. My shift lead finally chimed in and said, "Vince, Chuck didn't say that". Vince semi-lightened up but aimed all questions at me. Not one time did he question the two white guys that he got the phone call from. He continued to instruct me on how to make them feel comfortable at my expense for feeling comfortable for me. I told him that I couldn't do anything to make someone feel comfortable who just lied on me. He asked me if I would still be able to work with them. I said, "Sure, I would be able to work with them because I don't represent Chuck, I represent M C Dean". He asked the white guys could they work with me; Mike didn't answer at all. Eric said, "No, that he could not work with me because of what has transpired." A few of my coworkers gasped at Eric's response and one said, "wow!" I replied, "Wow, he lies on me and he can't work with me." That meeting ended because it was pretty much time to get off and we have narrowed down that it was a lie and would not affect my work ethic and performance. The very next Friday Vince called me into another meeting and questioned what I can do to make them comfortable. I told them that it was the same answer that I had the previous Sunday and there is nothing that I can do to make a person who lied on me comfortable. At that time, I was told by Vince that I could not say certain words. Those words were privileged, black or white. I replied with, "You all can call Jason the electrician, 'Black Jason' but we can't call Jason the BOC operator 'white Jason." Vince reiterated that I can't say those words because it makes them (white staff) feel uncomfortable. I replied with, they should have the same outlook for us. That meeting ended because I had to get to the tasks of my shift. The very next Friday, I was called into a meeting for a third time, Vince continued to talk the same nonsense to me. I informed Vince that if he calls me to another meeting on this subject, I would be filing against him for harassment. After that, the pressure and attitudes from the upper staff changed drastically. That is where I believe Mr. Arrington chose to treat me in a way and suggests that I quit.

Finally, I was denied a wage to match an offer letter from another company. I expressed to Mr. Arrington that I did not want to leave for the reasons of I didn't want to be the new guy at another company. Mr. Arrington saw my work performance firsthand and was impressed by the detail and knowledge I have of the trade. Mr. Arrington looked at my offer letter. His body language changed and the appreciative tone of my experience and knowledge of the trade was

no longer there when he spoke.  Mr. Arrington's first words to me after reading the offer letter were where did the offer letter came from, in a very belittling tone and that he didn't know that company.  I replied with, "Do you know the name of my company?"  He said, "no".  I told him the name of my company and that it has been in existence for 22 years and he still didn't know my company.  I said to him, in all that time of knowing my company and being in the trade for over 40 years, I, don't know every company. He replied with a non-committed voice of, "I'll see what I can do."  I said, "Ok" and left.  I believed that he thought I was lying about my offer letter. In the response from M C Dean, I must believe that he had to say something to someone to write down that it was not a valid offer letter.  Truth be told, it was an offer letter from a vending contracting company that had some sort of contract with M C Dean on Ft. Belvoir Army Base.

Mr. Arrington expressed that I received a 3% pay raise in December 2022 and in April 2023.  Everyone received those yearly raises.  The one in December 2022 was late.  Mr. Arrington said that I wasn't complaining about the yearly wage that everyone was getting.  I am objecting to the offer letter raise that he says was forged.  ('m going to have to investigate Mr. Arrington about saying that I forged the offer letter.). Mr. Arrington said according to your response, that no employee under Mr. Arrington received a wage increase April or May of 2023.  I was no longer employed in May 2023, but I know for sure in March or April that one of my friends received a wage from an offer letter in March or April.


People that you can contact to question.  I don't wish any retaliation to come to those that you question, so please be discreet as possible.

Abdul Carr -Chief Engineer Terminated   301-535-7331

Brandon Mayhew – Fire Technologist (Voluntary Resign). 443-995-6347

Jason Reiff – BOC Operator (Current Employee of M C Dean) 301-491-2060

Johnny Mobley – BOC Operator (Current Employee of M C Dean) 202-826-1175

Matt Turnbough – 443-878-5963

Ray Lopez – Locksmith 703-915-6501

Scott Weslocky – Plumber 240-882-1370

Tony Arrington – Supervisor that took over Mike Dunn's position 813-528-6242

Vince Berry – Supervisor 313-348-7760

William Hubbard – Plumber (Terminated) 240-273-8131

Dennis Fowler – Shift Lead (Current Employ 443-433-6732

Mike Dunn – Starting Supervisor 443-694-1748

Leta Fitzhugh – Supervisor 202-213-3531

NavyFederal Credit Union

Hello,

My name is William Rice.

I'm writing this letter, to inform that I'm going through a hardship.

Both of my parents have become I'll. Mother has dementia and multiple other illnesses. She has been admitted to a facility. My father has been diagnosed with stage 2 myeloma. He no longer has use of his legs and arm are rapidly losing strength.

This had become very demanding on my work schedule. As a result, I was terminated form my job, due to missed scheduled day, in a two year period.

I'm starting to get a better handle on the situation. I'm talking to a social worker that helped in assisting with my mother. She is in the process of helping with my father.

I should be able to return to work on a regular schedule shortly afterward.

Thank you for your patience in through out my shortcomings.

William Rice